# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

ERIKA ERDAHL,               :
        Plaintiff,         :
                    :
v.                    :       C.A. No. 12-298L
                    :
LIBERTY LIFE ASSURANCE    :
COMPANY OF BOSTON,       :
        Defendant.      :

## <u>REPORT AND RECOMMENDATION</u>

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff Erika Erdahl applied for long-term disability benefits under her employer's policy, which was administered by Defendant Liberty Life Assurance Company of Boston ("Liberty"), claiming that she could not perform her sedentary occupation of "Learning Specialist" due to vague, but subjectively severe, pain throughout her body that persisted in the aftermath of a series of automobile accidents. After an extensive administrative process that involved hundreds of pages of medical records, multiple file reviews by a board certified physician and various nurses, and independent examinations of Ms. Erdahl by a board certified physician and a board certified psychiatrist, Liberty denied her claim. This case was timely filed challenging that determination; it arises under Section 502(a) of Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1132) for wrongful denial of long-term disability benefits, as well as under Rhode Island state law for breach of contract and bad faith pursuant to R.I. Gen. Laws § 9-1-33.

Both Ms. Erdahl and Liberty have made cross motions for summary judgment pursuant to Fed. R. Civ. P. 56; both contend that they are entitled to judgment as a matter of law based on the administrative record. In addition, Liberty has moved to strike certain factual statements in Ms.

Erdahl's Statement of Undisputed Facts because they are outside the administrative record and

not appropriate for consideration now.  All three motions have been referred to me for a report of

findings and recommended disposition.  Because I find that Liberty had a reasonable basis to

deny Ms. Erdahl's claim and the denial was well supported by substantial evidence, as well as

that her state law claims are preempted by ERISA, I recommend that Liberty's Motion for

Summary Judgment (ECF No. 21) be granted and that Ms. Erdahl's Motion for Summary

Judgment (ECF No. 16) be denied.  Finally, while many of the facts challenged by the Motion to

Strike are in the record, some are not.  Accordingly, I recommend that the Motion to Strike (ECF

No. 26) be granted in part and denied in part.

## I.    <u>Background Facts</u>

### A.  <u>The Plan</u>

Ms. Erdahl's employer, Factory Mutual Insurance Company d/b/a FM Global ("FM

Global"), offered coverage to its employees under a group disability insurance plan, which is a

welfare benefit plan governed by ERISA.  Under the Plan, the definition of long-term disability

("LTD") is bifurcated.  For the first twenty-four months of eligibility, "Disability" means that

"the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and

Substantial Duties of his <u>Own Occupation</u>."  AR000007 (emphasis supplied).  Thereafter,

"Disability" means that "the Covered Person is unable to perform, with reasonable continuity,

the Material and Substantial Duties of Any Occupation."  <u>Id.</u>  "Own Occupation" means the

applicant's occupation as of the onset of disability, as that occupation is normally performed in

the national economy.  AR000009.

When Liberty receives proof of disability from the claimant, together with evidence that

the claimant's condition requires the regular attendance of a physician, it must pay a monthly

benefit, subject to other provisions in the Plan.  While the responsibility to present evidence to prove her claim rests with the claimant, the Plan gives Liberty the right to require the claimant to be examined or evaluated as deemed necessary by Liberty, at its expense.  LTD benefits can only be awarded to a claimant who was previously found eligible for the full twenty-six week period maximum under FM Global's short-term disability ("STD") policy.

Because STD eligibility is a prerequisite to LTD benefits, it is worth noting that the definition of "Disability" in the related (but separate) STD plan focuses not on the applicant's "Own Occupation" as performed in the national economy, but rather on the "Material and Substantial Duties of [her] Own Job."  AR000926 (emphasis supplied).  STD benefits are payable for a maximum of twenty-six weeks.  Thus, an individual who qualifies for STD benefits based on the inability to perform her own job may not qualify for LTD benefits if she retains the functional capacity to perform her own occupation, as it is performed in the national economy. FM Global's STD plan is also administered by Liberty.

In language that is critical to cabining the scope of this Court's review, the LTD Plan provides that Liberty has the authority, in its sole discretion, to construe the terms of the policy and to determine benefit eligibility under the policy.  Moreover, the Plan explicitly states that, "Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."  AR000036.

### B.  Ms. Erdahl's "Own Occupation"

To establish the physical demands of Ms. Erdahl's "Own Occupation," Liberty procured an occupational analysis/vocational review.  The resulting report examined the job description of her position of "Learning Specialist," and concluded that the tasks required are best represented in the Dictionary of Occupational Titles by the occupation of "Technical Training Coordinator,"

3

an occupation that is most often performed at a sedentary to light level of physical demand and is an occupation that allows for sedentary opportunity.  AR000103.  The only information presented by Ms. Erdahl regarding the functional requirements of her "Own Occupation" was the same job description as that relied on by the vocational expert.  While arguing that her "Own Job" may have had some additional physical challenges, Ms. Erdahl did not present any evidence to challenge the conclusions in the report of Liberty's vocational expert regarding the demands of her "Own Occupation."

### C.  <u>Short-Term Disability</u>

A young and apparently athletic woman prior to the events that initiated her disability odyssey, Ms. Erdahl was involved in multiple automobile accidents between 2002 and 2010 – the record is a bit confused as to the number, but there may have been as many as five.  At the onset of her STD claim, she was employed as a Learning Specialist; overall, she had worked at FM Global since 2002.  In January 2010, after going through the third automobile accident in a year, and suffering from a left shoulder injury and multiple body aches, including low back pain, she applied for STD benefits under FM Global's group disability insurance plan.

The processing of Ms. Erdahl's STD application began with the collection of applicable medical records, which were turned over to a nurse at Liberty for review.  Based on an extensive review of these records, which had been collected from multiple providers and dealt not only with the sequelae of the accidents, but also other medical issues such as anxiety, a history of back surgery, and post-traumatic stress disorder, the nurse determined that it was reasonable to conclude that Ms. Erdahl was restricted from working at her own job.  As a result, she was found to be eligible for STD benefits.  The nurse also recommended that updated medical records be obtained.

On February 22, 2010, Ms. Erdahl informed Liberty that Dr. Leonard, her primary care physician, had diagnosed her with fibromyalgia.[1] She continued to report severe pain, anxiety and depression. Nevertheless, on February 24, 2010, Liberty received an assessment from another treating physician, Dr. Mason, who opined that Ms. Erdahl could return to work part time with restrictions and progress to full time. Other treating providers concurred as long as she received certain accommodations, to which her employer agreed. Accordingly, on March 1, 2010, Ms. Erdahl returned to work and Liberty closed her STD claim.

The return to work was not a success. By March 15, 2010, Ms. Erdahl reported to Liberty that working was not going well, that she was being evaluated for back surgery and wanted to resume her short-term disability claim as of March 22, 2010. After receiving notification that she had undergone a diagnostic procedure on her back and after receiving medical records from Dr. Almeida that indicated she could perform a sedentary job but would be in treatment until April 26, 2010, Liberty extended her short-term disability benefits to that date and then extended them again to permit a full medical review of her claim.

A nurse was again assigned the task and a second detailed review of all of Ms. Erdahl's records as of that date was completed. The nurse noted a diagnosis of degenerative disc disease, but that Ms. Erdahl's providers continued to advise conservative treatment, not surgery. The nurse also observed references to anxiety, depression and post-traumatic stress disorder. Although several providers had opined that Ms. Erdahl could perform sedentary work, the nurse recommended that Liberty obtain updated medical records and perform yet another medical review. As a result, her short-term disability benefits were extended again to May 28, 2010.

---

[1] According to Dr. Martinez, the independent medical examiner who reviewed the filed for Liberty, "'fibromyalgia syndrome', . . . is a relatively poorly understood chronic pain disorder of unknown etiology . . . Clearly, the pain associated with [t]his disorder is relatively benign in nature, in the absence of evidence of soft tissue, muscular or joint pathology as well." AR000162.

5

### D.  **Consideration of Long-Term Disability**

By letter dated May 27, 2010, Liberty advised Ms. Erdahl that the maximum period for STD would expire on July 25, 2010, and that for the remainder of the STD period, her file would be reviewed not just for eligibility for STD, but also for whether she was eligible for LTD benefits.  The joint STD/LTD analysis began with a Peer Review of all of Plaintiff's medical records by Dr. Brenman, a board certified physician in physical medicine and rehabilitation with a certificate in pain management.  To prepare his report, Dr. Brenman looked at all the medical records and attempted to speak to one of Ms. Erdahl's key treating physicians (the pain specialist), but she failed to return his calls.  He was provided with Ms. Erdahl's job description to permit him to form an opinion on her ability to do that job.

Dr. Brenman's report dated June 21, 2010, concluded that Ms. Erdahl was impaired as a result of her 2004 diskectomy and mild lumbar disk degeneration in her ability to lift, carry and squat, but she would have no restrictions on her ability to sit, stand, walk or work at a keyboard. He opined that her subjective complaints of muscle discomfort would not preclude her from working.  Dr. Brenman's Peer Review report was sent to Ms. Erdahl's treating providers, all of whom were asked to communicate any disagreement.  Ms. Erdahl was made aware that Liberty was waiting for comments from her providers and asked to urge them to respond.  Liberty received no feedback regarding, and no disagreement with, Dr. Brenman's conclusions.

Based on Dr. Brenman's unrebutted opinion regarding her restrictions, and on the fact that her job was sedentary (and she had been offered an accommodation to have a sit-stand work station), Liberty notified Ms. Erdahl on July 14, 2010, that she was no longer qualified for STD benefits as of May 28, 2010.  Further, her LTD claim was denied because she had not maintained STD eligibility for the full twenty-six week period.

Ms. Erdahl responded with additional medical records and a pain journal.  The new material included a letter from Dr. Leonard stating that "[b]ased on my observation of the patient previously, I do not believe she can undertake any sort of meaningful work because of her pain and severe discomfort. . . . my hope is that her autoimmune condition and treatment of her autoimmune condition can restore her to functioning in the future."  AR000912.  Dr. Leonard's letter did not specify what autoimmune condition she was referring to and mentions no medical tests to diagnose one.  The new material also included a letter from Dr. Pearl that said that Ms. Erdahl cannot "tolerate a 4 hour work day due to pain with both sitting and standing. . . . In my opinion, . . . pt is temporarily totally disabled from work."  AR000909-910.  Neither Dr. Leonard nor Dr. Pearl had made any comment on Dr. Brenman's conclusions.

On October 19, 2010, Ms. Erdahl engaged counsel, who filed a formal appeal from the decisions of July 14, 2010, denying further STD benefits and finding her ineligible for LTD benefits.  Liberty promptly supplied counsel with a complete copy of the administrative record.  Then, on January 13, 2011, through counsel, Ms. Erdahl submitted over 700 pages of medical records, many duplicates of what had been submitted before but some that Liberty had not previously seen.

Once again, Liberty submitted all of the records to a nurse for review.  The new records mentioned that Ms. Erdahl had had minimally invasive spine surgery and a spinal injection to reduce pain.  They referred to elevated inflammatory markers, to consideration of connective disease and to psychiatric issues.  They included an evaluation of a neurologist, who found no acute neurological issues and recommended that Ms. Erdahl return to work, and one from a rheumatologist, who found her symptoms consistent with fibromyalgia but recommended exercise and sleep maintenance.  Like the records already reviewed, none of the new records

linked any physical condition to Ms. Erdahl's subjective report of body-wide pain, which was the basis for her claim of an inability to work.  Because the file was not particularly well developed on the psychiatric concerns, Liberty's reviewing nurse raised the possibility that psychiatric issues could support Ms. Erdahl's claim of impairing restrictions.  To allow time to explore that possibility, on January 21, 2011, Liberty informed Ms. Erdahl that her STD benefits would be continued to July 25, 2010, the maximum date, making her potentially eligible for LTD benefits.

At this point, Liberty's review of Ms. Erdahl's eligibility for LTD benefits began in earnest.  Her counsel promised to provide additional medical records, and Liberty ordered an Independent Medical Examination ("IME") from Dr. Martinez, a board certified specialist in physical medicine and rehabilitation and an Independent Psychiatric Evaluation ("IPE") by Dr. Harrop, a board certified specialist in general psychiatry.  Ms. Erdahl was resistant to the independent examinations.  Initially, she asked to have a third-party observer present during both examinations and to be able to record them; the Liberty case manager consulted with the legal department and refused to permit either an observer during the examination or a video recording.  Ms. Erdahl also failed to appear for her scheduled appointments.  Both were rescheduled and the second time she attended.

Dr. Martinez's ten-page report of his examination of Ms. Erdahl, dated April 6, 2011, summarized all of the records that he reviewed, which included not only those of Ms. Erdahl's treating providers, but also her pain journal.  His diagnostic impression, consistent with most of the diagnostics in her record, was "[c]hronic low back pain syndrome" and "[d]iffuse chronic pain syndrome."  AR000161-162.  Notwithstanding the diagnosis, his report stated that he found no demonstration of significant pain behaviors and no objective evidence of significant soft

tissue disease.  He observed that her low back pain was relatively benign in etiology and not

clinically significant.  He found that her limitations were the result of:

> [P]rominent pain-avoidance behavior and relative inactivity . . .  [which] is not
> medically indicated, nor facilitative in terms of improving her overall predicament
> in the long-term.

AR000162.  After reviewing her job description, he concluded that "she has the physical

capacity to perform the activities described therein on a full-time basis."  AR000163.

Dr. Harrop's psychiatric examination described in his report dated April 12, 2011,

yielded a mental status examination within normal limits.  While he found that Ms. Erdahl

suffered from Adjustment Disorder and frustration because she was not pain-free, he found no

impairments, restrictions or limitations that would prevent her from performing her occupation

from a psychiatric perspective.  He wrote:

> I would agree with other providers that there is a strong psychological overlay in
> this particular patient. . . . The pain and limitations that she does have, while
> minimal, are particularly annoying to her."

AR000169-170.  His report concluded: "A return to work is likely to be good for her."

AR000170.

Based on these independent examinations, Liberty reached its final conclusion that Ms.

Erdahl had no medical or psychiatric impairment that would preclude her from performing the

sedentary occupation of her "Own Occupation."  In a letter dated May 19, 2011, Liberty advised

Ms. Erdahl that her LTD claim was denied with a detailed statement of the reasons for reaching

that conclusion.

Ms. Erdahl filed her administrative appeal on November 15, 2011,[2] which was referred to

Liberty's Appeal Review Unit.  In her appeal, her principal argument was based on Liberty's

---

[2] Although the timeliness of the appeal was open to question, Liberty accepted it and made another substantive review.

refusal to allow her to have a witness or to record the independent medical and psychiatric examinations; in addition, she accused Dr. Martinez of making inappropriate and unprofessional remarks during the IME, denigrating her treating physicians, telling her to drop her claim and attempting to solicit her as a patient.  As a result, she contended that both reports should be disregarded, leaving only the conflicting evidence of her treating providers for Liberty's consideration.  Notably, her appeal does not attack any of the medical conclusions contained in either the IME or the IPE report; instead, she argued that both supported her contention that she suffers from pain.  Focusing on her "Own Job," though acknowledging that the LTD definition of disability looks to her "Own Occupation," she argued that some of her medical records and her pain journal include references to limitations on sitting for more than twenty minutes that would make it impossible to perform her job, which requires her to sit for extended periods.

Upon receipt of the appeal, the Appeal Review Unit requested an Occupation Analysis/Vocational Review of the requirements of Plaintiff's job position.  A report was received on December 22, 2011, which concluded that Ms. Erdahl's occupation is most often performed at a sedentary to light level of physical demand, with opportunities to maintain at a sedentary level.  The Appeal Review Unit also procured another full medical review by a nurse, who again examined all of the medical evidence, observing that, while some of Ms. Erdahl's providers had opined that she could not work, others found no serious physical issues, and several urged her to increase her level of activity, including to return to work.  While the claim of improper comments by Dr. Martinez was noted, the nurse focused on his and Dr. Harrop's medical conclusions, as well as those of Dr. Brenman.  With no new medical information to raise any question regarding their conclusions, on January 23, 2012, Liberty advised Ms. Erdahl that the information received on appeal did not alter the prior claim determination.

I add – but do not rely on in evaluating Liberty's decision to deny LTD benefits because it is not part of the administrative record – the coda: in June 2011, Ms. Erdahl left the employ of FM Global and, by March 2012, she had secured employment with Zurich North America in Dallas, Texas.[3]

## II.   Standard of Review

### A.   Summary Judgment in an ERISA Case

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, discovery, disclosure materials and affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006). The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). The standard for summary judgment is different in denial of benefits cases under ERISA. Normally, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000). In ERISA cases by contrast, the First Circuit has explained the standard as follows:

> In an ERISA benefit denial case, trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.

---

[3] Liberty offered this information in a declaration of its Litigation Manager, based on public information published on what purports to be Ms. Erdahl's "Linked-In" profile on the Internet. This information was not presented in connection with consideration of the merits of the determination of disability, but rather to establish that, if the matter were remanded, Liberty would reopen its administrative process to evaluate whether and for how long Ms. Erdahl was disabled, with the period of potential recovery extending, at most, to the date of her new job. At argument, her counsel did not dispute that she had left FM Global and was working at a new job and did not move to strike this fact.

Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002).  Accordingly, where the record

before the Court is the same record that was before the plan administrator, summary judgment is

simply a vehicle for deciding the benefits issue and the non-moving party is not entitled to the

usual inferences in its favor.  Scibelli v. Prudential Ins. Co. of Am., 666 F.3d 32, 40 (1st Cir.

2012); Chapman v. Supplemental Benefit Ret. Plan, 861 F. Supp. 2d 41, 45 (D.R.I. 2012).  The

Federal Rules of Evidence do not apply to an ERISA administrator's benefits determination and

the Court reviews the entire administrative record, including hearsay evidence relied upon by the

administrator.  Herman v. Hartford Life & Accident Ins. Co., 508 F. App'x 923, 928 (11th Cir.

2013) (quoting Black v. Long Term Disability Ins., 582 F.3d 738, 746 n.3 (7th Cir. 2009)).

## B.    Arbitrary and Capricious Standard of Review Applies

The pith of the dispute between these parties is the applicable standard of review to be

used by this Court in examining Liberty's decision.  Ms. Erdahl argues that this Court must

review the evidence de novo, requiring a determination "whether, upon a full review of the

administrative record, the decision of the administrator was correct."  Orndorf v. Paul Revere

Life Ins. Co., 404 F.3d 510, 518 (1st Cir. 2005).  In support of her argument, she relies on

Figueiredo v. Life Insurance Co. of North America, 709 F. Supp. 2d 137, 142-44 (D.R.I. 2010), a

case that turned on the absence of plan language constituting a sufficiently clear grant of

discretionary authority to transform judicial review from de novo to deferential.

This argument is totally unavailing.  Liberty's Plan contains language[4] clearly delegating

discretionary authority to the plan administrator; indeed, the precise same language was

considered by the First Circuit in Denmark v. Liberty Life Assurance Co. of Boston, 481 F.3d 16

(1st Cir. 2007), reh'g granted, modified, 566 F.3d 1 (1st Cir. 2009), which held that such

---

[4] The discretionary language states:  "Liberty shall possess the authority, in its sole discretion, to construe the terms
of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms
of this policy and benefit eligibility shall be conclusive and binding."  AR000036.

language is a sufficient delegation of discretionary authority to trigger deferential review based on the arbitrary and capricious standard.  481 F.3d at 28-29; 566 F.3d. at 9.  This is consistent with the holding of the United States Supreme Court that when the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan, the court must apply the deferential "arbitrary and capricious" standard of review.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Zarro v. Hasbro, Inc., 896 F. Supp. 2d 134, 140 (D.R.I. 2012).

Under this "generous" standard, Medina v. Metro. Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009), the reviewing court must uphold the decision of the administrator determining eligibility for benefits unless it is "arbitrary, capricious, or an abuse of discretion."  Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010).  The administrator's decision will be upheld if it is "reasoned and supported by substantial evidence."  Medina, 588 F.3d at 45-46; Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998).  "Evidence is substantial if it is reasonably sufficient to support a conclusion."  Vlass v. Raytheon Emps. Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001) (citations omitted).  "[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."  Id.  While arbitrary and capricious review is not to be wielded as "a rubber stamp," "the hallmark of such review [is] that a court is not to substitute its judgment for that of the [decision-maker]."  Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 5 (1st Cir. 2003); Terry v. Bayer Corp., 145 F.3d 28, 40 (1st Cir. 1998) (citations omitted).

One of the factors that the First Circuit has been clear that this Court must consider is whether there is a structural conflict potentially infecting the decision in that the plan administrator is also the entity that pays claims.  Denmark, 566 F.3d at 9.  However, the mere

13

existence of a structural conflict does not change the standard of review from deferential to *de novo*. Cusson, 592 F.3d at 224. Rather, a structural conflict is merely a consideration to be examined as one of a myriad of factors in evaluating the administrator's decision. Denmark, 566 F.3d at 9. In the absence of any evidence suggesting that the theoretical conflict has morphed into an actual conflict, a structural conflict might be a tiebreaker when the other factors are in equipoise but otherwise should be afforded little weight. Id.; see Chapman, 861 F. Supp. 2d at 47-48. Moreover, if the administrator has taken active steps to mitigate the effect, the importance of the structural conflict is reduced, "perhaps to the vanishing point." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116 (2008); see Denmark, 566 F.3d at 10.

On the record before this Court, Liberty advises that there is a structural conflict arising from its dual role as both administrator and payer of benefits under the LTD policy; however, it also points out that this theoretical conflict was mitigated by Liberty's engagement of three independent reviewing physicians (two of whom performed examinations as well as file reviews).[5] More importantly, Ms. Erdahl has not argued or pointed to any evidence suggesting that the structural conflict infected Liberty's decisionmaking in this case, which is her burden to do. See Cusson, 592 F.3d at 224-25 (claimant bears the burden of showing that structural conflict influenced administrator's decision). Under such circumstances, the existence of a structural conflict should be afforded little to no weight by this Court. Denmark, 566 F.3d at 10; Kindelan v. Disability Mgmt. Alternatives, LLC, 706 F. Supp. 2d 210, 218 (D.R.I. 2010).

---

[5] In addition, Liberty's willingness to repeatedly reopen Ms. Erdahl's STD claim under the STD policy and to continue to pay benefits, making her eligible for LTD benefits, is itself some evidence undermining the existence of an actual conflict. See Prince v. Metro. Life Ins. Co., Civil No. 08-cv-471-JL, 2010 WL 988730, at *2 & n.2 (D.N.H. Mar. 16, 2010) (finding evidence of prior award to same claimant by same plan administrator undermines showing of actual conflict).

### III.    Analysis of Liberty's Denial of LTD Benefits

ERISA is a statutory framework that "Congress enacted . . . to protect the interests of participants in employee benefit plans," Johnson v. Watts Regulator Co., 63 F.3d 1129, 1132 (1st Cir. 1995), and to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law." N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656 (1995).  To promote these objectives, ERISA provides that an employee who participates in an "employee welfare benefit plan" may bring a civil action against the plan's administrator "to recover benefits due to [her] under the terms of [her] plan."  29 U.S.C. § 1132(a)(1)(B).  Liberty's Plan is unquestionably an ERISA employee welfare plan and Ms. Erdahl is undoubtedly a covered participant.  The issue is whether Liberty abused its discretion by denying her claim for LTD benefits.

Apart from her plaint over Liberty's refusal to open the independent examinations to observation and recording, Ms. Erdahl makes no attack on the procedures used by Liberty to process her claim, nor could she because they were eminently reasonable.  At every phase, Liberty actively encouraged her to submit any medical evidence she felt was relevant to her claim; indeed, it inserted itself into the collection effort, working closely with Ms. Erdahl to ensure that every record she considered relevant had been procured.  At each stage, she and, once she engaged counsel, her attorney were urged to provide additional records.  And every time a new tranche of material was provided, Liberty submitted it to qualified professionals (nurses and board certified physicians) for exhaustive review.  In all, the administrative record swelled to 1,541 pages of material, most of which were medical records.  Over the course of the pendency of the claim, all of the records were thoroughly and repeatedly reviewed.  Every time her attorney requested a copy of the administrative record as of various points in time, the entire

15

record was promptly provided.  Ms. Erdahl was kept informed of the progress of her application. Each of Liberty's decision letters was lengthy and detailed, laying out the basis for the decision and (until the final denial) inviting her to supply new records that might demonstrate that she in fact was disabled under the Plan.

Rather than attacking the reasonableness of Liberty's procedure, Ms. Erdahl asks this Court to focus on statements made by certain of her medical providers, such as Dr. Pearl, who relied on subjective pain reports and opined that Ms. Erdahl was "temporarily totally disabled," Dr. Leonard, who diagnosed fibromyalgia and opined that she could not "undertake any sort of meaningful work because of her pain and severe discomfort," and Physician Assistant Linkiewicz, who initially thought she could return to work with difficulties, but subsequently concluded that she was disabled.  In an argument that seems misguidedly grounded in *de novo* review, Ms. Erdahl asks this Court to give special weight to this subset of her treating physicians, and to disregard her other treating physicians, such as Dr. Rizvi, who suggested more aggressive psychological treatment for her pain and opined that "she should try her best to continue to go back to work," as well as to disregard or give less weight to all three of the board certified physicians from whom Liberty procured independent evaluations.

Ms. Erdahl's argument stumbles on the well-settled principle that, in making benefits eligibility determinations, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Medina, 588 F.3d at 46 (citations omitted); see also Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 (1st Cir. 2007) ("[A] plan administrator is not obligated to accept or even to give particular weight to the opinion of a

claimant's treating physician."). Further, when the treating physicians never reach a clear consensus regarding the cause of the subjective symptoms, "an insurer is not required to blindly accept conclusory findings provided by an insured's physician." Prince, 2010 WL 988730, at *12 (citations omitted). Contradictory evidence does not by itself make the administrator's decision arbitrary. Vlass, 244 F.3d at 30. Indeed, contradictory views from Ms. Erdahl's own doctors lends substantial support to Liberty's decision to deny her claim. Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004); Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003).

The overall consensus that emerges from Ms. Erdahl's medical records is that her debilitating pain is a subjective symptom unrelated to an objective medical cause. More importantly, the record is devoid of objective evidence of functional limitations, which the First Circuit has expressly held is reasonable to require. See, e.g., Richards v. Hewlett-Packard Corp., 592 F.3d 232, 241 (1st Cir. 2010) ("while the evidence may have supported the diagnoses of fibromyalgia . . . , every reviewing, board-certified doctor, with the exception of [one of plaintiff's treating physicians], found that [plaintiff] could perform a sedentary job . . ."); Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 17 n.5 (1st Cir. 2003) ("[w]hile the diagnosis of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."). Particularly when facing a diagnosis based on the patient's self-reported pain symptoms, plan administrators are entitled to give weight to "documented, objective evidence of disability." See Cusson, 592 F.3d at 227 (where insurer did not question diagnosis, but determined that diagnosis did not affect ability to work, reasonable to rely on lack of documented evidence in deciding plaintiff not eligible for disability benefits). In a case like

17

this one, where the effects of pain from a condition like fibromyalgia is all subjective, and the doctors who opine that claimant is disabled have accepted her subjective complaints without question, but many of claimant's other doctors question the intensity of the pain, there is ample support for an administrator's denial of the disability claim. Prince, 2010 WL 988730, at *11.

The totality of the information contained in this administrative record demonstrates that Liberty's determination that Ms. Erdahl retained the functional capacity to perform sedentary to light physical work, which was all that was required by her "Own Occupation," is reasonable and well supported by substantial evidence. While this record could be capable of competing inferences as to the extent of her ability to work, "the hallmark of such review [under the arbitrary and capricious standard] is that a court is not to substitute its judgment for that of the [decision-maker]." Terry, 145 F.3d at 40 (citation omitted). When conflicting medical records could lead to conflicting decisions as to whether a plaintiff is disabled, this Court must defer to the decisionmaker when the record contains evidence reasonably sufficient to support the decisionmaker's decision. See Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000).

Accordingly, I find that Liberty's decision denying Ms. Erdahl's claim for LTD benefits was reasonable, well supported by substantial evidence and not arbitrary and capricious. See id. at 421.

## IV.    Liberty's Denial of Request for Witness or Recording of IME and IPE

Ms. Erdahl contends that Liberty's refusal to allow her to bring a third party observer or to record the IME performed by Dr. Martinez and IPE performed by Dr. Harrop was an abuse of discretion so that this Court should strike both the IME and IPE reports from the administrative record, despite her lack of criticism of the medical conclusions contained in them. As to the

IME, her argument includes the additional – and hotly disputed – allegation that Dr. Martinez

made unprofessional remarks during the IME.  Both arguments are unavailing.

While no cases were found discussing whether it would be an abuse of discretion for an

ERISA plan administrator to refuse to permit a third party observer to attend, or a recording to be

made of, an independent examination as part of its administrative procedure, useful guidance is

available from the cases interpreting Fed. R. Civ. P. 35.  Reaves v. Wayne Auto. Fire Sprinklers,

Inc., No. 2:11-cv-00049-CEH-SPC, 2011 WL 4837253, at *3-4 (M.D. Fla. Oct. 12, 2011) (IME

to be conducted under Rule 35 during litigation phase of ERISA case, may not be attended by

third party observer unless plaintiff can show special need, which plaintiff has not done).  These

cases advert to the clear majority of federal courts as having refused to permit third party

observers at Rule 35 examinations.  Cabana v. Forcier, 200 F.R.D. 9, 12 (D. Mass. 2001).

Cabana summarizes the rationale underlying courts' reluctance to permit third party attendance:

> 1)  the special nature of the psychiatric examination requires direct and
> unimpeded one-on-one communication without external interference or
> intrusion; 2) in contrast to depositions and other forms of discovery, Rule 35
> expert examinations are not intended to be adversarial; 3) fairness dictates that
> if defense counsel cannot be present when a plaintiff is interviewed by a
> psychiatrist who will testify at trial on his behalf, then plaintiff's counsel
> cannot be present when plaintiff is examined by defendant's expert
> psychiatrist; and 4) any concerns with distortions or inaccuracies by the
> examining psychiatrist can be addressed through traditional methods of
> impeachment and cross-examination.

Id. (quoting Baba-Ali v. City of New York, 1995 WL 753904, at *3 (S.D.N.Y. Dec. 19, 1995)).

In this Circuit, the approach articulated in Cabana has been embraced recently by the District of

Puerto Rico.  Perez Ortiz v. Colon Zambrana, Civil No. 09-2261 (PG), 2010 WL 3894648, at *1-

2 (D.P.R. Sept. 23, 2010); see also Dunlap v. Hood, No. 07-2147, 2008 WL 4851316, at *1

(N.D. Tex. Nov. 7, 2008) ("A party has no right to the presence of any third person . . . at a [Rule

35] physical or mental examination.").

19

Federal courts are similarly reluctant to permit recordings to be made of independent medical or psychiatric examinations.  See, e.g., Newman v. Gaetz, No. 08 C 4240, 2010 WL 4928868, at *1-2 (N.D. Ill. Nov. 29, 2010) (disruption from recording equipment more than offsets petitioner's argument of good cause based on his language and educational deficits); Morrison v. Stephenson, 244 F.R.D. 405, 407-08 (S.D. Ohio 2007) (risk that examiner might conduct de facto deposition offset by plaintiff's ability to prepare and access to report after the examination; motion for video recording equipment denied); see also Commonwealth v. Stockwell, 686 N.E.2d 426, 429 (Mass. 1997) (trial court properly exercised discretion to refuse to permit recording of psychiatric examination of criminal defendant); cf. Place v. Abbott Laboratories, Inc., 938 F. Supp. 1373, 1379 (N.D. Ill. 1996) (medical provider not liable to plaintiff under ERISA for refusing to perform IME when plaintiff insisted on using tape recorder during exam).

I find that Liberty's denial of Ms. Erdahl's request for a third party observer or to record both of her independent examinations was well within its discretion.  Ms. Erdahl presented no special or unique circumstances justifying her request and the cases interpreting Rule 35 make clear not only that there are good reasons to refuse such requests, but also that federal courts are strongly disinclined to grant them as a general matter.

Ms. Erdahl's arrow aimed at excluding Dr. Martinez's report, based on inappropriate non-medical comments allegedly made during the IME, also falls wide of the mark.  Her complaint about Dr. Martinez's conduct has no bearing on the viability of his medical conclusions and is not linked to any critique of his carefully crafted report.  See Rice-Peterson v. Unum Life Ins. Co. of Am., No. 11-14565-BC, 2012 WL 3109404, at *1-3 (E.D. Mich. July 31, 2012) (claim that doctor was rude, condescending and insulting at IME not grounds to disregard

opinion or open up discovery).  To the contrary, Ms. Erdahl's appeal letter specifically relies on

Dr. Martinez's conclusions that she suffered from chronic low back pain and diffuse chronic

pain.  Also significant is the fact that Ms. Erdahl did not raise her complaints about Dr. Martinez

until her appeal letter, written seven months after the IME, by which time the administrative

procedure was essentially concluded.  Further, she has not provided any countervailing objective

medical evidence contradicting either Dr. Martinez's conclusions or his observations drawn from

her medical records and referenced in the IME report.

 The touchstone of this Court's review is reasonableness.  I find that Liberty's decision to

deny Ms. Erdahl's request for a third party observer or for recording of her IME and IPE and

Liberty's decision to rely on the resulting IME and IPE reports, which are consistent with the

totality of the rest of the medical records, are both well within its discretion and entirely

reasonable.[6]  Ms. Erdahl's argument that this Court should not consider either the IME report or

the IPE report in examining whether Liberty's decision rested on substantial evidence should be

rejected.

**V.** **Preemption of Claims for Breach of Contract and under Rhode Island Bad Faith Statute**

 Liberty is entitled to judgment on Ms. Erdahl's claims for breach of contract and

violation of the Rhode Island bad faith statute (R.I. Gen Laws § 9-1-33) because these state law

claims are preempted by ERISA.  ERISA is "a comprehensive statute designed to promote the

interests of employees and their beneficiaries in employee benefit plans," including eliminating

"the threat of conflicting and inconsistent State and local regulation" in order to promote

---

[6] Even if this Court granted Ms. Erdahl's request to strike the IME and IPE from the administrative record, the outcome of this case would not be affected.  The conflicting evidence of Ms. Erdahl's treatment providers, the lack of objective evidence supporting her subjective complaints of pain and Dr. Brenman's report together constituted substantial evidence on which Liberty could have based its denial of LTD benefits. See Rice-Peterson, 2012 WL 3109404, at *3.

uniformity of interstate benefit plan administration.  Shaw v. Delta Air Lines, 463 U.S. 85, 90,

99 (1983).  ERISA's preemption clause, § 514(a), states that ERISA "shall supersede any and all

State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by

ERISA.  29 U.S.C. § 1144(a).  Because Liberty's Plan is governed by ERISA and Ms. Erdahl's

state law claims relate to the Plan, they are preempted.  Stamp v. Metro. Life Ins. Co., 466 F.

Supp. 2d 422, 428-29 (D.R.I. 2006) (Rhode Island breach of contract claim preempted by

ERISA); Desrosiers v. Hartford Life & Accident Ins. Co., 354 F. Supp. 2d 119, 129 (D.R.I.

2005) (Rhode Island bad faith statute was preempted by ERISA); Morris v. Highmark Life Ins.

Co., 255 F. Supp. 2d 16, 27 (D.R.I. 2003) (Rhode Island bad faith statute subject to ERISA

preemption).  The civil enforcement provisions of ERISA were "meant to preempt state laws that

relate to an ERISA plan . . . and any alternative enforcement mechanism that purports to remedy

the violation of a right guaranteed by ERISA."  Stamp, 466 F. Supp. 2d at 428-29 (citation

omitted).

Ms. Erdahl's Rhode Island state law claims – for breach of contract and based on the bad

faith statute – are preempted by ERISA and should be dismissed.

**VI.    <u>Liberty's Motion To Strike</u>**

Liberty moves to strike certain factual statements in Ms. Erdahl's statement of undisputed

facts as outside of the administrative record and therefore inappropriate for consideration by this

Court.  This is consistent with the general rule in ERISA cases that the deferential review of the

final administrative decision should be limited to the evidentiary record presented to the

administrator.  Lopes, 332 F.3d at 5.  Attempts by claimants to submit subsequent medical

records are routinely rejected because the final decision acts as a temporal cutoff point for the

administrative record.  Orndorf, 404 F.3d at 519.  Here, however, Ms. Erdahl's allegedly ex-

administrative record factual assertions are not new medical evidence, but rather are fairly innocuous facts, many of which actually are in the administrative record – mostly in her appeal letter, a document that appears prominently in the administrative record.  In this category are the following items, numbered as they are listed in Liberty's Motion to Strike: items 1,[7] 2,[8] 4, 9 and 10.[9]  The other challenged "factual" statements are not in the record, but do not attempt to inject new facts, but rather constitute argument.  While these should be stricken as facts, this Court has not disregarded them but rather has considered them as argument.  These include items 3, 5, 6, 7 and 8.

Accordingly, the Motion to Strike items 3, 5, 6, 7 and 8 should be granted; the balance of the Motion to Strike should be denied.

## VII.   <u>Conclusion</u>

I recommend that Liberty's Motion for Summary Judgment (ECF No. 21) be GRANTED and that Ms. Erdahl's Motion for Summary Judgment (ECF No. 16) be DENIED.  I recommend that Liberty's Motion to Strike (ECF No. 26) be GRANTED IN PART and DENIED IN PART.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its service.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  <u>See</u> <u>United States v. Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

---

[7] Ms. Erdahl's address is in the administrative record, albeit redacted.  AR000088.

[8] Ms. Erdahl's beginning date of service at FM Global is in the administrative record.  AR000057.

[9] The statements in items 4, 9 and 10 are in the appeal letter, which is in the administrative record at AR000110-117.

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 3, 2013